

**FILED**

Jan 12 2021, 8:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Deshay Hackner, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff,* | January 12, 2021 <br><br> Court of Appeals Case No. <br> 19A-CR-1577 <br><br> Appeal from the Tippecanoe <br> Superior Court <br><br> The Honorable Randy J. Williams, <br> Judge <br><br> Trial Court Cause No. <br> 79D01-1803-MR-1 |

**Robb, Judge.**

# Case Summary and Issue

[1]     Following a jury trial, Deshay Hackner was convicted of two counts of murder; two counts of robbery, Level 5 felonies; and admitted to possessing a firearm and being an habitual offender. The trial court sentenced Hackner to an aggregate sentence of 157 years. Hackner now appeals and raises one issue for our review: whether the trial court abused its discretion by admitting certain evidence. Concluding the trial court did not abuse its discretion, we affirm.

# Facts and Procedural History

[2]     In October 2017, Hackner, who goes by the name "Wireman," and his wife, Toni Wilson, lived in a house on West Maryland Street in Evansville with Wilson's best friend, Diamond Oldham. Oldham's boyfriend, William Rice, would stay at the house on occasion but also had his own apartment. At the time, neither Hackner nor Wilson had jobs or money.

[3]     That month, Oldham saw Rice and Hackner with a black revolver, a silver revolver, and a .22 caliber long pistol. Oldham had seen Rice "just playin [sic] with [the guns], like showin' em off." Transcript, Volume IV at 155. Wilson and Oldham also witnessed Hackner with the firearms at a friend's apartment. Several days later, Hackner had the firearms at the West Maryland Street house. Around October 26 or 27, Oldham and Hackner traveled to Owensboro, Kentucky with a group of people to go to a club. On their way back to Evansville, Hackner stopped at gas station and went inside to get a

drink while Oldham stayed in the vehicle. Oldham observed a group of approximately fifteen people hanging out and taking videos in the parking lot. Dewone Broomfield, Hackner's friend, was among the group and flashed a "big stack" of money. *Id.* at 173. On October 28, Oldham took a video via Snapchat of Hackner playing with the silver and black guns.

[4] On October 30, Broomfield had eye surgery and was recovering at home in Evansville with his girlfriend, Mary Woodruff. Hackner and Rice knew about Broomfield's surgery. The same day, Wilson and Hackner got into a physical altercation at their home. Wilson and Oldham left and walked to the gas station. Prior to leaving, Wilson and Oldham both observed the three firearms inside the house. When they returned from the gas station, Wilson and Hackner continued to argue and fight. Hackner left the house with Rice. Hackner had the .22 caliber long pistol "[a]round his neck" and handed the black revolver to Rice. Tr., Vol. V at 110. Hackner said they were going to his mother's house and the two left.

[5] Hackner and Rice went to Hackner's mother's house, which was approximately two blocks from Broomfield and Woodruff's house. After briefly going inside, Hackner and Rice walked to Broomfield and Woodruff's house to check on Broomfield. Woodruff answered the door and let them in. Broomfield was lying in a bed in the front room; Woodruff laid down on the bed with him. Shortly thereafter, Broomfield was shot three times with a .22 caliber long pistol; he suffered one gunshot wound near his left eyebrow and two gunshot wounds to the right side of the body. Woodruff was shot twice with a .38 black

revolver, one gunshot to her left temple and another to her cheek. Hackner and Rice fled the residence with money and drugs; Rice believed Broomfield and Woodruff were both dead.

[6] Broomfield called 911. When asked who shot him, Broomfield responded, "Why man." Tr., Vol. III at 5. During the 911 call and as officers began to arrive, Broomfield identified the individual who shot him as "Deshaw Hacker," "Deshay. D. and William Rice," and "Deshawn Hackner." *Id.* at 7-11. Officer Josh Brewer of the Evansville Police Department, who was wearing his body camera, entered the home and found Broomfield lying on the floor moaning. Woodruff was on the bed unresponsive. At some point, Officer Brewer asked Broomfield, "Was it Deshay?" *Id.* at 11. Broomfield did not provide a verbal confirmation but Officer Brewer stated to other officers on the scene, "Hey I asked him was it Deshay and [Broomfield] shook his head yes[,]" which had not been captured on the body camera footage. *Id.* Broomfield and Woodruff were transported to different hospitals but neither survived their injuries.

[7] After Rice and Hackner fled, Hackner called Wilson and instructed Wilson and Oldham to "pack a bag" and stated, "[W]e are going to a hotel." Tr., Vol. V at 112-13. Hackner and Rice picked them up in a cab, traveled to a hotel, and checked in. Once the four got into the hotel room, Hackner told Wilson and Oldham, "[D]on't put anything in the trashcan, and . . . wipe your bottles off." Tr., Vol. IV at 169. Hackner pulled the .22 caliber pistol and the black revolver out of his pants and placed them on the counter near the bathroom. Hackner

also asked Rice to wipe down the guns. Rice wiped down the .22 with a towel and placed it under the bed.

[8] The next morning, Wilson and Oldham went to the courthouse for an unrelated proceeding. Hackner purchased a black Celica for $1,000 and a tan Lincoln town car for $1,500 to $2,000. Later that afternoon, Wilson and Oldham were in the Celica and followed Hackner and Rice, who were in the Lincoln. Hackner was driving. Officers located Hackner and attempted to initiate a traffic stop; however, he ignored the emergency lights and a pursuit ensued. When the Lincoln turned down an alley, "a black object [was] thrown from the passenger side window." Tr., Vol. III at 43. Eventually, Hackner and Rice were apprehended. Officers later returned to the alley and located a silver .22 caliber revolver, a small .22 caliber revolver, and a black .38 caliber revolver. Officers also searched the hotel room and recovered Hackner's .22 caliber long pistol.

[9] The State charged Hackner with two counts of murder; two counts of robbery, both Level 5 felonies; a firearm enhancement; and alleged he was an habitual offender. A jury trial was held from April 23 to May 3, 2019. At trial, Hackner objected to the admission of the evidence that Broomfield nodded his head in response to Officer Brewer's question as to whether it was "Deshay" who shot him. The trial court overruled the objection, and the jury watched the body camera footage. Officer Brewer testified that he interpreted Broomfield's nodding his head as a "yes" to his question. *Id.* at 14. Ultimately, the jury found Hackner guilty as charged and the trial court sentenced him to an

aggregate sentence of 157 years in the Indiana Department of Correction. Hackner now appeals.

# Discussion and Decision

## I. Admission of Evidence

[10]   Our standard of review in this area is well settled. We review the admission or exclusion of evidence for an abuse of discretion. *Troutner v. State*, 951 N.E.2d 603, 611 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when a trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004).

## II. Dying Declaration

[11]   Hackner contends the trial court abused its discretion by admitting evidence that Broomfield nodded in response to Officer Brewer's question about the identity of his shooter because it "was all based on an invalid dying declaration[,] was irrelevant and highly and unfairly confusing and prejudicial." Brief of Appellant at 16. We disagree.

[12]   Hearsay is a statement that "is not made by the declarant while testifying at the trial or hearing; and . . . is offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). A "statement" is an "oral assertion, written assertion, or nonverbal conduct if the person intended it as an

assertion." Evid. R. 801(a). Generally, hearsay is inadmissible unless it falls into one of the well-delineated hearsay exceptions. Evid. R. 802.

[13] A statement made by the declarant, "while believing the declarant's death to be imminent, made about its cause or circumstances" is admissible under the dying declaration hearsay exception. Evid. R. 804(b)(2). In order to determine if a declarant's statements were made with the belief that "death was imminent" and the declarant had "abandoned all hope of recovery," the trial court may consider the general statements, conduct, manner, symptoms, and condition of the declarant, which flow as reasonable and natural results from the extent and character of the wound or state of the illness. *Wallace v. State*, 836 N.E.2d 985, 991 (Ind. Ct. App. 2005), *trans. denied*. The admissibility of a "dying declaration" is based on the belief that persons making such statements are highly unlikely to lie. *Bishop v. State*, 40 N.E.3d 935, 944 (Ind. Ct. App. 2015), *trans. denied*.

[14] Hackner does not challenge that Broomfield's nonverbal act was made with the belief that his death was imminent while abandoning all hope of recovery. Instead, he claims that "[g]iven the suffering of Broomfield and his agonal movements, [we] should find that a nod is too ambiguous to be considered a nonverbal dying declaration." Br. of Appellant at 18. However, we believe the interpretation of Broomfield's alleged nonverbal act, which was not captured on Officer Brewer's body camera, is not a question of admissibility; instead, it bears more on Officer Brewer's credibility, a question solely for the finder of fact. *See Sandefur v. State*, 945 N.E.2d 785, 788 (Ind. Ct. App. 2011) (rejecting

the State's argument that an officer's testimony about nonverbal assertive conduct was not hearsay because it was his own interpretation of someone's conduct and stating that "the lack of certainty [about what the victim meant to say] bears more on the credibility of the testimony than whether it is hearsay").

[15] Here, the jury listened to the 911 call during which Broomfield identifies "Why man[,]" "Deshaw Hacker," "Deshay. D. and William Rice," and "Deshawn Hackner" as his shooters. Tr., Vol. III at 5-11. It watched the body camera footage and observed the events unfold and listened to Officer Brewer's testimony in court. The extent to which the jury relies on Broomfield's nod and accepts Officer Brewer's interpretation, and whether or not the evidence connects Hackner with the crimes, ultimately goes to the weight the jury may assign evidence, not admissibility. *See Jones v. State*, 472 N.E.2d 1255, 1260 (Ind. 1985) ("If the evidence only inconclusively connects the defendant with the crime, this goes to the weight, not the admissibility of the evidence. . . . [T]he weight to be given identification evidence and any determination of whether it is satisfactory and trustworthy is a function of the trier of facts."); *see also Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007) (stating that it is the jury's role, not ours, to assess witness credibility and weigh the evidence to determine if it is sufficient to support a conviction). Therefore, we conclude the trial court did not abuse its discretion in admitting this evidence.

# Conclusion

[16] The trial court did not abuse its discretion in admitting Broomfield's statement. Accordingly, we affirm.

[17] Affirmed.

Bailey, J., and Tavitas, J., concur.